## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| TINA FAGAN and MICHAEL FAGAN, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civ. Action No.: 14-7013 (FLW)(TJB) |
| | : | |
| K. SCOTT FISCHER, VERONIKA M. | : | **OPINION** |
| FISCHER, BRIAN E. CARROLL, BRUCE | : | |
| W. BREITWEISER, FISCHER | : | |
| INVESTMENT CAPITAL, LLC, BYANA, | : | |
| LLC, PRIVATE CAPITAL, LLC, | : | |
| FUNDER, LLC, BOWDER, LLC, | : | |
| WEALTH CAPITAL GROUP, LLC, | : | |
| DUNBAR BREITWEISER & COMPANY, | : | |
| LLP, JOHN/JANE DOES 1-5, fictitious | : | |
| individuals to be named after discovery, and | : | |
| ABC CORPS. 1-5, fictitious corporate | : | |
| entities to be named after discovery, | : | |
| Defendants. | : | |
| | : | |
| | : | |

**WOLFSON, U.S. Chief District Judge**:

This case arises from a failed business relationship between Plaintiffs Tina Fagan and Michael Fagan (collectively, "Plaintiffs" or "the Fagans") and Defendant K. Scott Fischer ("Scott Fischer"). Plaintiffs allege that Scott Fischer controlled various corporate entities, many of which are defendants in this action, which he utilized as vehicles to operate a fraudulent real estate investment scheme and loan program. In that regard, Plaintiffs further allege that they were duped into making debt and equity investments, totaling over $2 million dollars, in the Derbyshire Project, a real estate development project in North Carolina, and entities associated with Scott Fischer. Defendants Scott Fischer; Bowder, LLC ("Bowder"); Byana, LLC ("Byana"); Brian E.

Carroll; Veronika M. Fischer; Fischer Investment Capital, Inc.[1] ("FIC"); Funder, LLC ("Funder");

Private Capital, LLC ("Private Capital"); Wealth Capital Group, LLC ("Wealth Capital")

(collectively, "Defendants") now move for partial summary judgment on Counts I (Federal RICO),

II (conspiracy to violate RICO), III (New Jersey RICO), IV (Violation of Section 10(b) of the

Securities' Exchange Act and Securities Rule 10b-5), V (the New Jersey Uniform Securities Act),

VI (Common Law Fraud/Fraud in the Inducement), VII (Aiding and Abetting Common Law

Fraud), VIII (Equitable Fraud), IX (Conversion), X (Unjust Enrichment), XI (Breach of Contract

as to Defendant Scott Fischer only), and XIV (Breach of Fiduciary Duty) of the Second Amended

Complaint pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below,

Defendants' motion is **GRANTED IN PART and DENIED IN PART.** Summary Judgment is

**GRANTED** in favor of defendants Veronika Fischer, Bowder, Funder, and Wealth Capital, on all

of the claims against them, and those defendants are dismissed from the lawsuit. Summary

Judgment is **GRANTED** in favor of Defendants Scott Fischer, Brian E. Carroll, Private Capital,

FIC, and Byana on Counts I (Federal RICO), II (conspiracy to violate RICO), III (NJ RICO), IV

(Violation of Section 10(b) of the Securities' Exchange Act and Securities Rule 10b-5), V (the

New Jersey Uniform Securities Act), VIII (Equitable Fraud), IX (Conversion), X (Unjust

Enrichment), and XIV (Breach of Fiduciary Duty). Defendants Scott Fischer, Brian E. Carroll,

Private Capital, FIC, and Byana's Motion for Summary Judgment as to Counts VI (Common Law

Fraud/Fraud in the Inducement), and VII (Aiding and Abetting Common Law Fraud) is **DENIED.**

Scott Fischer's Motion for Summary Judgment on Count XI (Breach of Contract) is also **DENIED,**

but this claim is limited as outlined in this Opinion.

---

[1] Defendant Fischer Investment Capital, Inc. was improperly pled as Defendant Fischer
Investment Capital, LLC.

# I. Factual Background and Procedural History
## A. The Creation of Byana and the Related Fischer Entities

The following facts are not disputed, unless otherwise noted. Byana, a Delaware LLC, was formed by Defendants Scott Fischer and Brian E. Carroll, and Dan Taylor, a non-party, on August 22, 2006. ECF No. 120-2, Defendants' Statement of Material Facts ("SOMF") ¶14. Byana was created for the purpose of "acquir[ing], develop[ing] and sell[ing] parcels of land located in Columbus, North Carolina" for the Derbyshire Project. SOMF ¶14. Byana is owned by its members, including Plaintiff Tina Fagan, Defendants Funder and Wealth Capital, and other non-party members. SOMF. ¶5. Approximately one month after creating Byana, Scott Fischer formed Private Capital, another Delaware LLC, to serve as the developer of the Derbyshire Project. SOMF. ¶15. Scott Fischer is the managing member of Defendant Private Capital, which is, in turn, the managing member of Byana. SOMF ¶6. Private Capital is owned by Defendants Funder and Weiss Capital. SOMF ¶7. Funder is owned jointly by Scott Fischer and his wife, Veronika Fischer. SOMF ¶3-4.

Throughout September and November 2006, in a series of transactions, Byana acquired a total of 181.74 acres of undeveloped land in North Carolina, 133.63 acres of which was subject to mortgage, to be used for the Derbyshire Project. SOMF ¶¶16-22. Purchasing the properties cost Byana approximately $2,517,900, which it financed primarily through debt and equity investments. SOMF ¶20. From its inception, Byana was leveraged; in order to fund the initial land purchase, Scott Fischer and several Fischer related entities made non-interest-bearing loans to Byana, totaling approximately $1.15 million, in or around October 2006. SOMF ¶81-83. The loans do not appear to have been formally documented in a loan agreement, and Plaintiff disputes the legitimacy of the loans. In November 2006, Byana utilized funds of approximately $915,144 which it obtained from investors to acquire two additional properties, totaling 48.11 acres. SOMF

¶84.  After procuring those properties, Byana borrowed $4 million from Macon Bank to fund land development and operating costs.  SOMF ¶126.  The loan from Macon Bank was secured by the real estate which Byana owned.  *Id*.  Some of the funds, approximately $900,003.13,  that Scott Fischer and the Fischer-related entities loaned to Byana to finance the initial 2006 land purchases were repaid by Byana in December 2006.  SOMF ¶¶86-87, 94.  The remaining funds due were reclassified from a loan to a capital contribution by Funder.  SOMF ¶88.

B.     **The Fagans' Investments in Byana and the Related Fischer-Entities**

In 2006, Scott Fischer contacted Plaintiffs about potentially investing in the Derbyshire Project, and subsequently, sent them a confidential investment offering (the "Investment Offering"), as well as a copy of the Byana Operating Agreement, and an accredited investor questionnaire via email on October 9, 2006.  SOMF ¶¶23-24. 26.  In the email, Scott Fischer indicated that "we have closed on the largest parcel [for the project] and have advanced over $1.1 million."  SOMF ¶24.  At the time, the Fagans were purportedly unaware what Scott Fischer meant by "advanced" and did not know that it referred to the approximately $1.15 million in funds which Byana had received from Scott Fischer and the Fischer-related entities.  ECF No. 122-1, Plaintiffs' Responsive Statement of Facts ("Pl. Resp. SOMF") ¶25.

The overview portion of the Investment Offering stated, in pertinent part:

> Private Capital's investment objective is to acquire the land and complete the infrastructure necessary to sell the improved lots. Private Capital is working to find equity investors to co-invest in the acquisition and provide additional equity as needed for the land infrastructure improvements. This can be achieved on a leveraged or un-leveraged basis. Total capital requirements for the transaction are approximately $6 million. Initial land costs are $2.5M with estimated infrastructure costs of $2.5M. Additional costs will include marketing, selling and carrying costs. Private Capital has designed both a debt and

> equity investment structure. Upon completion of the
> project, the debt investor will receive the return of their
> investment plus 12% simple interest. In addition, they will
> receive a 5% discount on their choice of lot for each
> $100,000 invested (ex. $200,000 investment earns 10%
> discount). The equity investor will receive the return of
> their investment capital plus 1% of the net profit for each
> $100,000 invested (ex. $400,000 investment earns 4% of
> net profit).

SOMF ¶29; *see also* ECF No.120-5, Certification of K. Scott Fischer Cert, Ex. L, Investment

Offering. The Investment Offering also included a disclaimer which provided that the document

was prepared "solely for informational purposes" and did not constitute "all or any part of an offer

or contract" and that

> Private Capital LLC strongly recommends first that each
> potential investor review the information contained in this
> Investment Offering with its accountants, attorneys and tax
> advisors. While the information contained herein is from
> sources deemed reliable, it has not been independently
> verified by Private Capital, LLC nor the owner makes any
> representations or warranties, express or implied, with
> respect to the information.

SOMF ¶33; *see also* Investment Offering.

After reviewing the Byana Operating Agreement and investment materials, Mr. Fagan

and Scott Fischer had a follow up-conversation regarding the Derbyshire Project on October 12,

2006. SOMF ¶48. Plaintiffs assert, and Defendants dispute, that prior to investing in the project,

Scott Fischer and Brian Carroll, a friend of Mr. Fischer's and a member of the Development Team

for the Derbyshire Project, assured Mrs. Fagan that her investment would be fully protected from

loss. Plaintiffs aver that they were told that the Derbyshire Project was a "no brainer" as an

investment and that the investors would own the land "free and clear, debt free." *See* ECF No.

122-3, Certification of Michael A. Baldassare ("Baldassare Cert"), Ex. M, Deposition Testimony

of Michael Fagan of October 18, 2017 ("M. Fagan Dep.") 93:6-8. Plaintiffs also claim that Scott

Fischer represented that in the worst-case scenario "an asteroid lands on [the property], and nothing happens, and we have to sell the land, we'll always get our money back." *Id*. Thereafter, the Fagans made the decision to invest in the project, and on October 31, 2006, Mrs. Fagan executed the Byana Operating Agreement, and completed the accredited investor questionnaire. SOMF ¶¶50-51. The "Member Representations and Warranties" section of the Byana Operating Agreement included a provision regarding the "Investment Experience" of the member which provides:

> undersigned represents that he, she or it (i) has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of investment in interest in the Company and protecting his, her or its own interest in connection with the investment and has obtained, in his, her or its judgment sufficient information from the Manager to evaluate the merits and risks of an investment in interests in the Company, (ii) has not relied in [sic] any representations or warranties of the Company, the Manager, any Affiliate thereof or any officer, employee or agent of any of the foregoing with respect to the value of the interests of the Company, (iii) has the financial ability to bear the economic risk of an investment in the Company (including possible loss), has adequate means for providing for his, her or its currents needs and personal contingencies and has no need for liquidity with respect to the investment, (iv) has determined that the interests in the Company are suitable for him, her or it and that at this time he, she or it could bear the economic risk of the investment

Fischer Cert., Ex. B, Byana Operating Agreement ("Byana Operating Agreement") ¶11.3. The accredited investor questionnaire also inquired about the investor's experience and included questions about the investor's estimated net worth and taxable income for the next year. *See* Fischer Cert., Exhibit M, Accredited Investor Questionnaire ("Investor Questionnaire"). In response to the inquiries on the questionnaire, Mrs. Fagan indicated that she had "never" invested in privately placed securities before but, she responded "yes" as to the fact that she had "sufficient knowledge and experience in financial and business matters to be able to evaluate the merits and

risks of tax-oriented private placement investments, without relying upon the advise [sic] of an attorney, accountant or other advisor to make a final decision." *Id*.

Neither Mr. nor Mrs. Fagan consulted with an attorney, tax advisor, nor financial consultant regarding their investment or the materials provided to them by Scott Fischer. SOMF ¶54. During his deposition Mr. Fagan indicated that he did not know the purpose of the Investor Questionnaire. SOMF ¶66. The Fagans contend in this suit that they did not understand the risks of a private placement investment, or the representations made in the Investor Questionnaire, and that "the Investment Offering . . . has express misrepresentations regarding the (1) owner of the property, (2) the value of the property, and (3) the debt associated with the property." Pl. Resp. SOMF. ¶29, 73.

Although Mr. Fagan was heavily involved in the initial discussions with Scott Fischer regarding the Derbyshire Project, the Investor Questionnaire lists Mrs. Fagan as the investor, and she was the only one who signed the Byana Operating Agreement. The parties dispute why Mrs. Fagan was the sole individual listed on the documents, but nonetheless, it is clear that she made two equity investments in Byana, totaling $1,000,000, using her own funds, in exchange for a 10% membership interest in Byana. SOMF ¶¶80, 124. On November 6, 2006, Mrs. Fagan invested an initial $300,000 in Byana prior to visiting the properties. SOMF ¶¶74, 76. Thereafter, the Fagans visited North Carolina in November or December 2006, and allegedly met with Brian Carroll who showed them the undeveloped property. SOMF ¶76; Pl. Resp. SOMF ¶76. Plaintiffs allege that during the course of their visit, Brian Carroll "promot[ed] the Derbyshire Project as a low-risk investment opportunity." Compl. ¶57-59. After the trip, Mrs. Fagan made another $700,000 investment in Byana. *Id*. At the time Mrs. Fagan made both investments, she had not yet made a determination as to whether the funds would be treated as debt or equity and was afforded 60 days

to make such an election. Pl. Resp. SOMF. ¶76. Ultimately, she elected to have the investment treated as equity, and received the aforementioned 10% membership interest in Byana. Pl. Resp. SOMF ¶76.

In addition to Mrs. Fagan's equity investments in Byana, Plaintiffs also made various debt investments in entities associated with Scott Fischer. In April 2007, May 2007, and July 2007, Plaintiffs made three separate loans of $250,000 to FIC, totaling $750,000, (collectively, the "FIC Promissory Notes") pursuant to various promissory notes. SOMF ¶¶100-102; *see also* Fischer Cert., Ex. V, W, C. The loans, together with all accrued interest at a rate of 8.25%, were to be repaid by June 30, 2008, September 30, 2008, and December 31, 2008, respectively. *Id*. At the time the first promissory note was issued, Mr. Fagan requested that Scott Fischer personally guarantee the loans, but Scott Fischer refused. SOMF ¶¶106-107.

In July and October 2007, Plaintiffs also made two loans to Byana (collectively, the "Byana Notes") of $250,000 each, to be repaid in July and October 2009, with interest payments of 12% ($2,500) to be paid to Plaintiffs on a monthly basis. SOMF ¶¶113-116. FIC and Byana both failed to repay their respective loans on the due dates. Accordingly, in or around January 2009, Scott Fischer sought to modify the terms of the FIC Promissory Notes and the Byana Promissory Notes because "there wasn't much money left, and the sales weren't happening so they had to modify them." SOMF ¶¶117-18. The Fagans assert, and Defendants dispute, that Scott Fischer and Brian Carroll reassured Plaintiffs of the financial health of Byana, FIC, and the Derbyshire Project at that time. ECF No. 51, Second Amended Complaint ("Compl.") ¶¶80-81. As a result, Plaintiffs and Scott Fischer modified the payment schedule for the Byana and FIC loans by decreasing the interest payments, which were to be made monthly, and extending the maturity date of the loans through 2010. SOMF ¶121. At the time of the loan modification, Mr. Fagan was removed from

the promissory notes, and was not included as a party to the modification agreements. SOMF ¶123. On October 6, 2010, Mrs. Fagan received the final Byana interest check; thereafter, Byana and FIC ceased making interest payments and ultimately, defaulted on the loan. Around that same time period, Scott Fischer informed Plaintiffs that Macon Bank was demanding repayment of the $3.8 million development loan, and that the bank would foreclose on the properties if the loan was not repaid. SOMF ¶128. Subsequently, the Derbyshire Project collapsed.

The Fagans contend that Scott Fischer and Brian Carroll made various misrepresentations to Plaintiffs regarding the nature of the investment, and the liabilities owed by Byana. Further, although the parties agree that Plaintiffs were aware that there would be other investors in the Derbyshire Project, Plaintiffs contend that they "were never aware until it was too late that there were other Fischer entity investors." Pl. Resp. SOMF 30. Further, the Fagans dispute the legitimacy of the transactions between the Fischer-related entities. Pl. Resp. SOMF ¶¶81-97.

Consequently, Plaintiffs filed the instant lawsuit against Defendants, asserting claims for violations of state and federal Racketeer Influenced and Corrupt Organizations Act ("RICO") statutes, conspiring to commit RICO violations, common law fraud, aiding and abetting common law fraud, equitable fraud, conversion, unjust enrichment, breach of contract, and breach of fiduciary duty. Defendants now move for summary judgment on various counts.[2]

## II.     Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

[2]   In addition to the counts addressed in this Opinion, Defendants have moved for summary judgment on Counts Four and Five. In their Opposition Brief, Plaintiff voluntarily agreed to dismiss those counts Pl. Br. at n. 2; Pl. Br. n. 10. Accordingly, summary judgment is granted as to Counts Four and Five.

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate

specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## III. Analysis
### A. Standing

As an initial matter, the Court must determine whether Mr. Fagan has standing to pursue the current litigation. This Court has previously expressed concern regarding standing, and directed the Fagans to amend their Complaint to "specifically identify who owns each investment, including the debt investments" in order for the Court to determine who has been injured by Defendants' alleged actions, and, accordingly, who has standing to sue for the alleged injuries. *See* ECF No. 46, January MTD Opinion at 3 n.2.

In a footnote in the brief in support of their motion for summary judgment, Defendants contend that Mr. Fagan lacks standing to bring this action because "the funds at issue were Tina Fagan's, who also is the only Plaintiff that executed the accredited investor questionnaire and the Byana Operating Agreement. Accordingly, although the action was brought by both Tina Fagan and

Michael Fagan, the purportedly harmed party in interest is Tina Fagan." Def. Br. at 2 n. 1. Plaintiffs did not address Defendants' standing argument in their opposition brief.

"[T]he plaintiff bears the burden of establishing the elements of standing, and each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of a complaint for lack of standing. Fed. R. Civ. P. 12(b)(1). Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." *Lance v. Coffman*, 549 U.S. 437, 439 (2007). Indeed, "[s]tanding to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "The standing inquiry ... focuse[s] on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 360 (3d Cir. 2014) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008) (alterations original).

To show standing, a plaintiff must establish: "(1) an injury-in-fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 272 (3d Cir. 2016) (quoting *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193 (3d Cir. 2016))(internal quotation marks and citations omitted). To allege injury-in-fact, "a plaintiff must claim the invasion of a concrete and particularized legally protected interest resulting in harm that is actual or imminent, not conjectural or hypothetical." *Nickelodeon*, 827 F.3d at 272 (quoting *Finkelman*, 810 F.3d at 193 (internal quotation marks omitted).

Mr. Fagan has failed to show that he has a "legally protected interest" implicated in the funds at issue, and therefore, does not have standing to pursue the instant litigation. At the outset of this lawsuit, Plaintiffs alleged that they "collectively suffere[ed] losses in an amount at least $2,000,000." Compl. ¶16. However, at this stage, it is undisputed that the funds invested in Byana belonged solely to Mrs. Fagan, and thus, were not marital property. *See* SOMF ¶124. At her deposition, Mrs. Fagan explained that she and her husband "reached an understanding together, an agreement, that we wanted to invest . . . with Scott." Fischer Cert., Ex. E, Deposition of Tina Fagan ("T. Fagan Dep.") 26:17-22. According to Mrs. Fagan, it was her understanding that she and her husband made the investment in Byana jointly: "I think we just put it under my name, but it was . . . together." *Id.* 27:6-11. However, she clarified that the money utilized for the investments, which came from a prior marriage, belonged solely to her. *Id.* 26:17-22. Although Mrs. Fagan believed that she and her husband were joint investors in Byana, Mrs. Fagan, alone, signed the Investment Questionnaire and the Byana Operating Agreement, and, as such, Mrs. Fagan – not Mr. Fagan – has an interest in Byana.

Similarly, Mr. Fagan has no interest in the Byana and FIC promissory notes. The initial promissory notes were payable to "Mike and/or Tina Fagan," however, when the loans were modified in 2009, Mr. Fagan requested to be removed from promissory notes. SOMF ¶123. Consequently, he was omitted from the loan modification agreements. *Id*. Although the FIC Loan Modification Agreement lists the "lenders" as "Mike & Tina Fagan" and provides a signature line for each of them, only Mrs. Fagan signed the document. *See* Fischer Cert, Exs. BB, CC. Further, the Byana Loan Modification Agreement lists "Tina Fagan" as the lender and she, alone, signed the documents. *Id*. Accordingly, Mr. Fagan is not a party to any of the contracts – the promissory notes and the Byana Operating Agreement – at issue in this litigation. It is axiomatic that "[o]ne

who is not a party to a contract has no status to sue upon it if he be a person with whom the contracting parties never meant to come into contractual relations." *Crown Fabrics Corp. v. Assur. Co.*, 10 A.2d 750, 752–53 (N.J. 1940). Accordingly, Mr. Fagan lacks standing to participate in this lawsuit, and he is dismissed as a plaintiff.[3]

### B. Choice of Law

The parties disagree regarding which state's law governs the state law fraud and breach of contract claims. Defendants contend that under the terms of the Byana Operating Agreement, this matter is governed by Delaware law. The operating agreement provides:

> THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF DELAWARE EXCLUDING ANY CONFLICT OF LAW RULES OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION. ALL ACTIONS BROUGHT TO INTERPRET OR ENFORCE THIS PROVISION SHALL BE BROUGHT IN THE COURTS LOCATED IN THE STATE OF DELAWARE, AND THE PARTIES HERETO AGREE TO WAIVE ANY CLAIM BASED ON LACK OF PERSONAL JURISDITION, INAPPROPRIATE VENUE OR FORUM NONCONVEINES"

Operating Agreement, Section 10.6. "In a federal question case, a district court entertaining pendent state claims should follow the choice of law rules of the forum state." *Weikel v. Tower Semiconductor Ltd.*, 183 F.R.D. 377, 400 (D.N.J. 1998). The choice-of-law rules of the forum state govern "which body of substantive law to apply to a contract provision, even where a contract contains a choice-of-law clause." *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 183 (3d Cir. 2017). In New Jersey, "effect [is given] to contracting parties' private choice of law clauses unless they conflict with New Jersey public policy." *General Motors Corp. v. New A.C. Chevrolet, Inc.*, 263

---

[3] As Mr. Fagan has been dismissed from the lawsuit, the remainder of this Opinion will refer to Mrs. Fagan as the sole plaintiff.

F.3d 296, 331 n.21 (3d Cir. 2001) (citing *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 614 A.2d 124, 133 (N.J. 1992)).

However, whether a choice of law provision in a contract also governs the parties' non-contractual claims, such as tort and fraud claims, turns on the breadth of the provision. *See e.g*, *Sullivan v. Sovereign Bancorp Inc.*, 33 F. App'x 640, 642 (3d Cir. 2002)(explaining that where an agreement's choice of law provision is "broad and all-encompassing," the provision "encompasses all tort claims that may arise from the [agreement]."); *Pro v. Hertz Equip. Rental Corp.*, No. 06-3830, 2008 WL 5218267, at *5 (D.N.J. Dec. 11, 2008)("Choice of law clauses that use the language 'governed and construed by,' . . . are considered to be broad capturing both contract and tort claims, particularly tort claims that relate to the contract. By contrast, choice of law clauses that use narrower language such as 'construed under' are sometimes limited to contract claims and generally do not apply to tort claims that arise independent of the contract."); *Demmick v. Cellco P'ship*, No. CIV.A. 06-2163, 2010 WL 3636216, at *3 (D.N.J. Sept. 8, 2010)(finding that contract's choice of law provision was sufficiently broad to govern fraud claims where contract provided that it was "governed by" New Jersey law, and fraud claims shared the same factual basis as breach of contract claims"). Here, the relevant question is whether the choice of law provision in the Byana Operating Agreement encompasses Plaintiff's non-contractual claims. The Court finds that it does not.

In *Black Box Corp. v. Markham*, 127 F. App'x. 22 (3d Cir. 2005), a merger agreement between the parties contained a choice of law provision, which stated the agreement "will be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Pennsylvania." *Id.* at 23 n.1. The Third Circuit found that the language utilized was "narrowly drafted to encompass only the underlying merger agreement itself, and not necessarily the entire

relationship between [the parties]." *Id.* at 25. Similarly, the choice of law provision at issue in this case is also narrowly drafted and provides that *the agreement* shall be governed by and construed in accordance with Delaware law, and does not purport to cover issues beyond the four corners of the agreement. The agreement's choice of law provision, by its plain terms, clearly only applies to actions brought to interpret or enforce the operating agreement; the instant case is not such a suit. Indeed, Plaintiff has not alleged a breach of the Byana Operating Agreement[4], or alleged any claims which stems directly from the operating agreement, itself. Rather, Plaintiff's lawsuit involves RICO and tort claims which do not require interpreting the terms of the contract and, as such, the claims fall outside the scope of the Byana Operating Agreement. Thus, the contractual choice-of law-provision does not control.

Because the choice of law provision does not govern the instant matter, the Court turns to New Jersey's choice of law rules. Under those rules, the Court must determine whether there is an actual conflict between the relevant laws of New Jersey and those of the other state at issue (here, Delaware). *P.V. ex rel. T.V. v. Camp Jaycee,* 962 A.2d 453, 460 (N.J. 2008)*; Lebegern v. Forman,* 471 F.3d 424, 430 (3d Cir. 2006). If there is not an actual conflict, the inquiry ends and New Jersey law must be applied. *Id.* In the event a conflict exists, the court must determine which state's law has the "most significant relationship" to the claim at issue. *Camp Jaycee*, 962 A.2d at 455. This test is applied "on an issue-by-issue basis" and "is qualitative, not quantitative." *Id.* at

---

[4] Although Count XI of Plaintiff's Second Amended Complaint is a breach of contract claim, Plaintiff alleges breaches of the Byana and FIC Promissory Notes. Those claims do not stem from the Byana Operating Agreement, and, accordingly, they are not governed by the choice of law provision in the Byana Operating Agreement. The Byana and FIC Promissory Notes each contain their own choice of law provisions which provide for the application of Delaware and North Carolina law, respectively. Neither party has suggested that those choice of law provisions govern the non-contractual claims in this litigation.

460. In this case, Defendants have not alleged that there is any conflict between New Jersey law and Delaware law regarding the common law claims, and therefore, New Jersey law applies.[5]

### C. RICO violations
#### 1. The Federal RICO claims

Plaintiff asserts violations of 18 U.S.C. §1962(c) and (d), the Federal RICO Act. Defendants contend that Plaintiff's Federal RICO claims are barred by the Private Securities Litigation Reform Act (PSLRA), because the alleged acts of wire fraud and mail fraud in Plaintiff's Second Amended Complaint are essentially securities fraud claims. Def. Br. at 6. Plaintiff does not challenge Defendants' contention that the PSLRA preludes RICO claims premised on acts of wire fraud which would otherwise be actionable as securities fraud. Rather, Plaintiff argues that neither the debt nor equity investments constituted securities. Pl. Br. at 8-15. Further, Plaintiff notes that Defendants had ample opportunity to raise this legal issue, and their delay in doing so is indicative of bad faith. Pl. Br. at 13.[6]

In 1995, Congress enacted the PSLRA which amended the RICO statute to eliminate securities fraud as a predicate act for a RICO claim. *Mathews v. Kidder, Peabody & Co.,* 161 F.3d 156, 157 (3d Cir. 1998). The amended language of the RICO Act explicitly states:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, *except that no person may rely upon any*

---

[5] Both Plaintiff and Defendants acknowledge that there is no difference between New Jersey and Delaware law regarding fraud or the other state law claims. Defendants' reply brief relies on both Delaware and New Jersey law in support of its arguments as to those claims. *See generally* ECF No. 123, Defendants' Reply Brief ("Def. Reply Br.")

[6] As an initial matter, the Court rejects Plaintiff's argument that Defendants' alleged delay in raising this issue is indicative of bad faith or otherwise undercuts the merits of Defendants' position. The determination as to whether an LLC interest and/or a promissory note constitutes a security is both legally and factually complex, and is the appropriate purview of a summary judgment motion, after Plaintiff has had the benefit of discovery.

> *conduct that would have been actionable as fraud in the purchase*
> *or sale of securities to establish a violation of section 1962.*

18 U.S.C. § 1964(c) (emphasis added).

Furthermore, the amended statute prevents a plaintiff from artfully "pleading mail fraud, wire fraud and bank fraud as predicate offenses in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud." *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 330 (3d Cir. 1999). To determine whether particular conduct may serve as the basis for a RICO predicate offense, a court must analyze "whether the conduct pled as predicate offenses is 'actionable' as securities fraud." *Id*. at 330.

Accordingly, the threshold question, is whether Mrs. Fagan's 10% membership interest in Byana and the debt investments in Byana and FIC constitute securities under the Exchange Act. If both the equity and debt investments constitute securities, then the RICO action is precluded by the PSLRA. Section 3(a)(10) of the Securities Exchange Act of 1934 defines a "security" as follows:

> any note, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 78c(10).

a)     The *Howey* Test

Although an LLC membership interest is not explicitly included in the Securities Exchange Act's definition of a security, courts routinely consider the possibility that LLC membership interests may be considered an "investment contract." *See e.g., Wen v. Willis*, 117 F. Supp. 3d 673, 685 (E.D. Pa. 2015)(analyzing whether LLC membership interest constituted an "investment contract"); *Sync Labs LLC v. Fusion Mfg.*, No. 11-03671, 2014 WL 37124, at *4 (D.N.J. Jan. 6, 2014) (analyzing whether LLC interest constituted either an "investment contract" or "stock"). In *S.E.C. v. W.J. Howey Company*, the Supreme Court determined that an investment instrument is an "investment contract," and therefore subject to securities laws, if it involves: (1) "an investment of money," (2) "in a common enterprise," (3) "with profits to come solely from the efforts of others." 328 U.S. 293, 301 (1946); *see also Steinhardt Grp. Inc. v. Citicorp*, 126 F.3d 144, 151 (3d Cir. 1997). The *Howey* test is a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299.

Here, Mrs. Fagan indisputably invested $1 million in Byana, which constitutes an investment of money, satisfying the first prong of the *Howey* test. 328 U.S. at 301. SOMF. ¶74. The second prong of the *Howey* test can be established by showing "horizontal commonality," which "is characterized by a pooling of investors' contributions and distribution of profits and losses on a pro-rata basis among investors." *S.E.C. v. Infinity Grp. Co.*, 212 F.3d 180, 187-88 (3d Cir. 2000) (internal quotation marks omitted) (quoting *Steinhardt*, 126 F.3d at 151). Plaintiff does not dispute that her investment in Byana was characterized by horizontal commonality. Indeed, Mrs. Fagan's funds were pooled with that of other investors in Byana and she shared in both the

profits and losses of the entity pursuant to her pro-rata 10% equity interest in Byana. SOMF ¶¶84, 93. Thus, there is no genuine dispute of material fact as to whether Mrs. Fagan's funds were invested "in a common enterprise." *Howey*, 328 U.S. at 301.

The third prong of the *Howey* test looks to "whether the purchaser be attracted to the investment by the prospect of a profit on the investment rather than a desire to use or consume the item purchased." *Steinhardt*, 126 F.3d at 152. In applying the third *Howey* factor in the context of LLCs and partnerships, courts in this circuit look at "whether the investor has meaningfully participated in the management of the [entity] in which it has invested such that it has more than minimal control over the investment's performance." *Id.* at 153; *Rossi v. Quarmley*, 604 F. App'x 171, 173 (3d Cir. 2015); *Wen*, 117 F. Supp. 3d at 685; *Great Lakes Chemical Corp. v. Monsanto Co.*, 96 F. Supp. 2d 376 (D. Del. 2000). Courts consider "the transaction as a whole, considering the arrangements the parties made for the operation of the investment vehicle in order to determine who exercised control in generating profits for the vehicle." *Steinhardt*, 126 F.3d at 153. Further, courts "consider both the facts of the relationship and the text of the agreements governing the transaction." *Rossi*, 604 F. App'x at 173–74.

In *Steinhardt Group*, the plaintiff, an investment firm, held a 98.79% interest in a limited partnership that was formed to create an investment vehicle for issuing debt and equity securities to investors. *Id.* at 145–46. The Third Circuit affirmed the district court's dismissal of the plaintiff's complaint, which alleged violations of federal securities law, finding that the plaintiff's investment in a limited partnership did not constitute an "investment contract." *Id.* at 145. The Third Circuit explained that the plaintiff could not "be deemed a passive investor under *Howey* and its progeny" because it had retained certain rights and powers giving it control over its investment. *Id.* at 145. Looking to the terms of the partnership agreement, the Third Circuit held

that it was irrelevant whether or not the plaintiff actually exercised its rights, because the relevant inquiry was what "legal rights and powers [were] enjoyed by the investor." *Id.* (quoting *Goodwin*, 730 F.2d at 107). The court explained that "the rights and powers assigned to Steinhardt under the [Limited Partnership Agreement]," which outlined the powers of the partners, "were not nominal, but rather were significant and, thus, directly affected the profits it received from the Partnership." *Id.* at 155. Accordingly, Steinhardt was not a passive investor and the partnership was not an investment contract under federal securities law. *Id.* at 154.

Similarly, in *Great Lakes Chemical Corporation*, the district court considered whether a membership interest in a LLC constituted an investment contract under federal securities law. 96 F. Supp. 2d at 391–92. The court explained that "to determine whether a member's profits are to come solely from the efforts of others, it is necessary to consider the structure of the particular LLC at issue, as provided in its operating agreement." *Id.* There, the members retained the power to remove the manager and dissolve the LLC. *Id.* Thus, the court concluded that although the members had no authority to directly manage the entity's business, the plaintiff had retained significant powers that directly affected the profits it received from the LLC, precluding the membership interest from being a security. *Id.*

Here, Mrs. Fagan did not exercise meaningful control over Byana and thus, clearly anticipated that her profits would be derived from the effort of others. The Investment Offering offered investors, such as Mrs. Fagan, the opportunity to contribute money to Byana to develop residences, which would be managed and sold by Private Capital. The Investment Offering includes a description of the "Development Team" for the Derbyshire Project and emphasizes the team members' extensive finance and real estate experience. Notably, Plaintiff did not have the ability to develop the properties, herself, and she was clearly relying on the experience of Private

Capital's Development Team, which included both Scott Fischer and Brian Carroll, individuals experienced with professional management of real estate projects, homebuilding, and financing, to manage the project. Plaintiff and her husband, professedly, did not understand many of the terms of the Investment Offering or the Byana Operating Agreement, thus she could not have anticipated meaningful participation in the Derbyshire Project. SOMF ¶¶59, 66-67, 70. Furthermore, even if Plaintiff had the relevant experience to actively participate in the management of the project, she did not have the authority to do so. The Byana Operating Agreement designated Private Capital as Byana's manager and vested in it "sole and exclusive direction and control" of Byana, in addition to a variety of other enumerated powers. *See* Operating Agreement, Section 4.1. None of the other LLC members, including Mrs. Fagan, were agents of the company or had the authority to act on Byana's behalf. *Id.* Unlike in *Steinhardt* and *Great Lakes*, Plaintiff was a passive investor who did not have the ability to exercise meaningful control over the LLC. Plaintiff was completely dependent on Defendants to seek investors, manage the invested funds, and develop the subject properties. *C.f. Wen*, 117 F. Supp. 3d at 685-6. (holding that LLC membership interest was not a security where plaintiff was one of the two member-managers of the LLC, had the ability to bind the LLC to a contract, and the majority of the LLC's business-related transactions required Plaintiff's consent). Further, Plaintiff had no ability to effect any change on the structure or existence of the LLC itself.

Nevertheless, Plaintiff argues that there is a genuine dispute of material fact as to whether she anticipated that the profits from the investment were "to come solely from the efforts of others," because the Fagans assisted Scott Fischer in attempting to locate potential new lenders for the Derbyshire Project, after the Macon Bank loan came due. Pl. Br. at 18. Thus, in Plaintiff's view, because she took on duties on behalf of the company, she was not a passive investor. *Id.*

However, the Third Circuit has held that "an investment contract can exist where the investor is required to perform some duties, as long as they are nominal or limited and would have 'little direct effect upon receipt by the participant of the benefits promised by the promoters.' " *Lino v. City Investing Co.*, 487 F.2d 689, 692 (3d Cir. 1973) (quoting Sec. & Exch. Comm'n Release Notice, Release No. 5211 (Nov. 30, 1971)). Here, Plaintiff's attempts to assist with locating additional investors does not appear to have been a requirement of her investment and was clearly limited in time and scope activity.

Finally, Plaintiff contends that irrespective of the analysis of the *Howey* factors, her interest in Byana should not constitute a security because: 1) she was permitted to choose whether she would like her investment to be a debt investment or equity investment, thus the "process of investment hardly resembles the sale of a security as envisioned by federal securities laws," Pl. Br. at 17; 2) Scott Fischer is not licensed to sell securities, *Id.*; and 3) Defendants did not register the securities as required by Section 5 of the Securities Act of 1933, Pl. Br. at 15. None of these facts impact the Court's analysis of the *Howey* factors, and Plaintiff has not cited case law suggesting that those additional circumstances are determinative of whether an investment constitutes a security; therefore, the *Howey* factors control. Accordingly, Defendants have established that there is no genuine dispute of material fact as to whether Plaintiff's membership interest in Byana constitutes a security.

### b) The *Reves* Test

Next, the Court must determine whether the Byana and FIC promissory notes also constitute securities. Although the Securities Exchange Act definition of a security includes "any

note,"[7] the Supreme Court has explained that the phrase "should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts." *Reves v. Ernst & Young*, 494 U.S. 56, 63 (1990); *see also* 15 U.S.C. § 78c(10).

To determine whether a "note" is a security, under federal securities law, courts apply the "family resemblance" test. *Reves*, 494 U.S. at 67. Under that test, every note is presumed to be a security, but this presumption can be overcome if the note satisfies either step of a two-tiered analysis. *Id*. at 65. Under the first step, courts compare the note in question to the other types of notes that the Supreme Court has specifically stated are not securities, such as

> the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business ...[and] notes evidencing loans by commercial banks for current operations.

*Id*. at 65. When applying the family resemblance test, courts are to consider the following four factors: (1) the parties' motivations for entering into the transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectations of the investing public; and (4) whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering the protections of the Securities Exchange Act unnecessary. *Id.* at 66-67. "Failure to satisfy one of the factors is not dispositive since they are considered as a whole." *Robyn Meredith, Inc. v. Levy*, 440 F. Supp. 2d 378, 384 (D.N.J. 2006) (citing *McNabb v. SEC*, 298 F.3d

---

[7] Exempt from the definition of "securities" is "any note ... which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited." 15 U.S.C. § 78c(a)(10). Here, the Byana and FIC Promissory Notes each had terms longer than nine months, thus do not fall within the scope of the exemption.

1126, 1132-33 (9th Cir. 2002)). However, if the analysis of the *Reves* factors reveals that the note does not share any characteristics with an item on the list of enumerated non-securities, then the note will not be classified a "security." *Reves*, 494 U.S. at 67. The court then moves on to step two, which is deciding whether a new category should be added to the list of non-securities. *Id.* at 67.

Here, Defendants do not identify a specific non-security note which they claim the Byana and FIC Promissory Notes resemble; rather, they argue that under the *Reves* factors, these notes are securities because 1) Mrs. Fagan was induced to make the loans in order in order to generate income via the interest payments she would receive; 2) each note had a term greater than six months; and 3) the reasonable expectation of the investing public would be that the notes constituted securities. Def. Br. at 10.

Under the first *Reves* factor, "[i]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'" *Reves*, 494 U.S. at 66. "If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a 'security.'" *Id.* Here, the Promissory Notes were clearly executed to raise money for Byana and FIC, respectively. The Investment Offering explained that Private Capital was seeking "investors to co-invest in the acquisition and provide additional equity as needed for the land infrastructure improvements." Investment Offering. The initial iteration of the promissory notes provided for 8.25% to 12% to be paid to Plaintiff and the modifications of the agreements also provided for

interest payments. *Reves*, 494 U.S. at 68 n. 4 ("profit" in the context of notes, we mean "a valuable return on an investment," which undoubtedly includes interest.").

Under the second *Reves* factor, the Court must "determine whether it is an instrument in which there is common trading for speculation or investment." *Reves*, 494 U.S. at 66 (citation and internal quotation marks omitted). "[T]he requisite 'common trading' in an instrument" is established if the instrument is " 'offered and sold to a broad segment of the public.' " *Id*. at 68. The parties have not elaborated on the plan of distribution for the Byana and FIC Promissory Notes, however, they do not appear to have been broadly distributed to the public, which would weigh against classifying the notes as "securities." However, the notes do not prevent sale or transfer to another individual, thus Plaintiff could have resold them, making them available to a broader segment of the public, if she so desired. *Compare Robyn Meredith, Inc. v. Levy*, 440 F. Supp. 2d 378, 386 (D.N.J. 2006) (finding that note did not constitute a security because "the note here was not issued to multiple parties, and neither party solicited the other in an attempt to raise money for general capital to trade commodities. The note was "nonnegotiable" and was "offered to a single party in connection with a specific commercial transaction.") *with Stoiber v. S.E.C.*, 161 F.3d 745, 750–51 (D.C. Cir. 1998)(finding second factor to be of "no clear direction" where the terms of the notes did not preclude trading in a secondary market, but "none have been resold and there is no indication that anyone has considered reselling them."); *see also Fox v. Dream Tust.*, 743 F. Supp. 2d 389, 400 (D.N.J. 2010) (finding second *Reves* factor to be neutral where the note "was apparently not marketed to anyone but plaintiff's family" but plaintiff was also "exactly the kind of individual investor that securities law seeks to protect, a point commonly considered under the second factor because the fact of common trading goes to the level of sophistication of

potential buyers."). Accordingly, the second factor is neutral and weighs neither for nor against finding the promissory notes to be securities.

Under the third *Reves* factor, the Court examines "the reasonable expectation of the investing public" to see if the public would view the notes as securities. *Reves*, 494 U.S. at 66. When a note seller calls a note an investment, in the absence of contrary indications "it would be reasonable for a prospective purchaser to take the [offeror] at its word." *Reves*, 494 U.S. at 69. The Investment Offering explained that Private Capital had designed "both a debt and equity investment structure" and promised debt investors 12% simple interest. *SEC v. Stoiber*, 161 F.3d 745, 751 (D.C. Cir. 1998) ("Whether notes are reasonably perceived as securities generally turns on whether they are reasonably viewed by purchasers as investments."). Based on the Investment Offering's plain language, the public would reasonably view these notes as securities.

The final *Reves* factor also weighs in favor of finding that the promissory notes are securities because the promissory notes were not protected by collateral and there is no other federal regulatory scheme that reduces the risk of these notes. *See Reves*, 494 U.S. at 69 (describing potential risk-reducing factors rendering a note a non-security such as collateral, insurance provided by the Federal Deposit Insurance Corporation, and regulation under the Employee Retirement Income Security Act).

Plaintiff has not overcome the presumption that the Byana and FIC Promissory Notes are securities. The notes do not resemble any of the categories of notes which the Supreme Court has previously determined are not securities. Moreover, all of the *Reves* factors, with the exception of the plan of distribution factor, suggest that the notes should not be treated as a new non-security category. Because both the debt and equity investments at issue in this litigation constitute

securities, Plaintiff's federal RICO claim (Count I) and RICO Conspiracy claim (Count II) are barred by the PSLRA.

## 2.    The New Jersey RICO Claims

Plaintiff has also alleged violations of N.J. Stat. Ann. 2C:41-2(c) and -2(d). Unlike the Federal RICO statute, the New Jersey RICO statute includes securities fraud as a predicate act.[8] *See* N.J. Stat. Ann. 2C:41-1(a)(p)(designating "fraud in the offering, sale or purchase of securities" as "racketeering activity").  Thus, Plaintiff's New Jersey RICO claim, unlike her federal claim is not rendered infirm by virtue of the fact that the Byana and FIC Promissory Notes and Plaintiff's Byana membership interest are securities.  However, Defendants nonetheless contend that Plaintiff cannot establish a pattern of racketeering activity, thus the New Jersey RICO claims should be dismissed.  Def. Br. at 39.

The New Jersey RICO statute states, "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity."  N.J. Stat. Ann. 2C:41–2(c).  Generally, the New Jersey RICO statute prohibits a person from being "employed by or associated with 'an enterprise' and to engage or participate or become involved in the business of the enterprise 'through a pattern of racketeering activity.'"  *State v. Ball,* 661 A.2d 251, 263 (N.J. 1995)(quoting N.J. Stat. Ann. 2C:41-2b and 2c).  To state a New Jersey RICO claim, a plaintiff must allege "(1) the existence of an enterprise; (2) that the enterprise engaged in or its activities affected trade or commerce; (3) that defendant was employed by, or associated with the enterprise; (4) that he or she participated in the

---

[8]  Defendants initially contended that the PSLRA ban precluded the state law RICO claims, as well. However, in their reply brief, Defendants withdrew their argument that the PSLRA ban applies to the NJ RICO claim. Def. Reply Br. at 1.

conduct of the affairs of the enterprise; and (5) that he or she participated through a pattern of racketeering activity." *Id.* Here, Defendants take issue with the last element.

The New Jersey RICO statute defines a pattern of racketeering activity as:

> (1) Engaging in at least two incidents of racketeering conduct one of which shall have occurred after the effective date of this act and the last of which shall have occurred within 10 years (excluding any period of imprisonment) after a prior incident of racketeering activity; and
> (2) A showing that the incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents.

N.J. Stat. Ann. 2C:41-1(d)(1-2). "[New Jersey] RICO was not designed to punish mere repeated offenses," thus, the key inquiry in ascertaining whether a pattern of racketeering activity exists is "relatedness." *Ball*, 661 A.2d at 265. Relatedness "calls for the application of a broad standard involving the totality of all relevant circumstances, which may include 'continuity.'" *Id.* In *Ball*, the New Jersey Supreme Court explained that "some degree of continuity, or threat of continuity, is *required* and is *inherent* in the 'relatedness' element of the 'pattern of racketeering activity.'" *Id.* Thus, New Jersey courts apply a "totality of the circumstances' approach in applying the federal 'continuity plus relationship' test for determining the existence of a pattern of racketeering activity." *Id.* (citations omitted). In applying the totality of circumstances test, courts consider: "the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity." *Id.* (quoting *United States v. Zauber,* 857 F.2d 137, 149 (3d Cir. 1988)). Further, where appropriate, the New Jersey RICO statute should be interpreted consistent with the Federal RICO statute. *See In re Schering–Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 245 (3d Cir. 2012)(analyzing state and federal RICO claims concurrently "because the two RICO statutes are intended to be coextensive"); *State v. Cagno,* 49 A.3d 388, 400 (N.J. 2012)("because

our New Jersey RICO statute is modeled upon its federal counterpart, it is appropriate to accept guidance from the federal RICO cases.").

The parties primarily dispute the application of the continuity requirement. Defendants contend that, at best, Plaintiff's allegations establish "a single alleged scheme against a single alleged victim" and fail to give rise to a RICO violation. Def. Reply Br. at 18. Relying primarily on federal law, Defendants reason that Plaintiff cannot establish a pattern of predicate racketing activities, and even if she could, she would not satisfy the continuity requirement because Mrs. Fagan made her first $300,000 equity investment on November 1, 2006 and her final debt investment on October 18, 2007. Def. Br. at 33-36. Thus, Defendants argue that Plaintiff cannot establish that the pattern of racketeering existed for at least twelve months, as required by federal law. *Id.* Further, Defendants contend, solely as to Veronika Fischer, that Plaintiffs have not identified a single wrongful act on Mrs. Fischer's part and have acknowledged that Plaintiff never met Mrs. Fischer and did not communicate with her. Def. Br. at 33. n. 12, 38.

In response, Plaintiff contends that, unlike under federal law, New Jersey does not have a "freestanding continuity requirement," Pl. Br. at 29, and further, that discovery has revealed evidence of multiple victims, namely, "the Fagans, Christine Sheffield, those in the Weiss Litigation, as well as those who, according to Scott Fischer's deposition testimony, settled claims in exchange for property in Byana)," and "multiple schemes (e.g., Byana, the promissory notes)." Pl. Br. at 27 n. 11. Plaintiff argues that those victims evidence a pattern of racketeering. *Id.* As to Veronika Fischer, Plaintiff contends that she is liable as a co-conspirator irrespective of the fact that she never directly interacted with the Fagans. Pl. Br. at 27.

In total, the similarly of the acts alleged, the character of the unlawful activity, and the number of unlawful acts, all support that Plaintiff is unable to demonstrate that Defendants

engaged in a pattern of racketeering. *Ball*, 661 A.2d at 265. Plaintiff's New Jersey RICO claim is premised on several predicate acts stemming from alleged misrepresentations made by Scott Fischer in soliciting Plaintiff's funds: proffering false and misleading statements relating to the value of Plaintiff's investment in the Derbyshire project, in violation of N.J. Stat. Ann. 2C:20-4(a)(theft by deception). *See* Compl. ¶¶162-169. Plaintiff has also alleged that Defendants made numerous interstate telephone calls, emails, and faxes to Plaintiffs and utilized United States mail and DHL to mail or receive from Plaintiffs copies of investment documents, loan documents, checks for interest payments, and checks for partial loan repayments, which all furthered their scheme to defraud Plaintiff of her money. *Id*. Plaintiff alleges that those acts were directed at defrauding Plaintiff of her investment and were not "isolated" or "sporadic" criminal incidents. *Ball*, 661 A.2d at 263. Nonetheless, they do not satisfy the pattern of racketeering requirement because the alleged acts lack continuity.

Although Plaintiff has identified a number of mailings, emails, and wire transfers that are related to her claims, the alleged acts of deceit – the misrepresentations made by Mr. Fischer and Brian Carroll – occurred at the outset of their business relationship, on a handful of instances. *Gannon v. Cont'l Ins. Co.,* 920 F. Supp. 566, 587 (D.N.J. 1996)(explaining that when analyzing continuity "[t]he instances of deceit, rather than the number of mailings, is the critical factor."). Furthermore, Plaintiff is the only identified victim of the scheme. Although Plaintiff alleges that Defendants also sought to defraud other investors, she simply has not pointed to any specific information in that regard. For example, Plaintiff alleges that, among other victims, Lee Weiss was an investor who wired money to Scott Fischer to invest in Private Capital, and he eventually filed a lawsuit (the "Weiss Litigation") against Private Capital. *See* Compl. ¶¶110-113. However, Plaintiff has not explained the claims at issue in that lawsuit or whether the facts indicate that

defendants' fraudulent conduct, to the extent any was alleged in that litigation, had similar purposes, perpetrators, methods of commission, or were otherwise related to the instant lawsuit, such that it could demonstrate a pattern of continuity under the totality of circumstances test outlined in *Ball*. In fact, Plaintiff has failed to produce such evidence regarding any of the other victims which she claimed were similarly subject to Defendants' fraudulent conduct. Discovery in this case has long-ended and without such information, this Court cannot find that the Weiss Litigation – or any other alleged victims –were part of a "pattern of racketeering."

At best, based upon Plaintiff's submissions, Plaintiff has demonstrated that Defendants devised a single scheme to deprive her of her funds; however, it "is well-settled that allegations of a single fraudulent scheme designed to deprive a single plaintiff of property does not adequately allege a RICO violation." *Leeder v. Feinstein*, No. 318-12384, 2019 WL 2710794, at *9 (D.N.J. June 28, 2019) (dismissing New Jersey state RICO claim for failure to demonstrate a pattern of racketeering where complaint alleged that defendant engaged in a scheme to defraud other victims, but did not provide specifics of the frauds perpetrated on those victims) *c.f. Ross v. Celtron Int'l, Inc.*, 494 F. Supp. 2d 288, 303 (D.N.J. 2007) (granting summary judgment in favor of Defendant on New Jersey RICO claim where plaintiff alleged an "isolated incident of fraud" to deprive a single victim of property, and did not demonstrate that any other person or entity was impacted by the scheme, thus plaintiff did not establish a pattern of racketeering activity); *see also Emcore Corp. v. PricewaterhouseCoopers LLP*, 102 F. Supp. 2d 237, 255 (D.N.J. 2000)(finding that plaintiff's allegation that defendants committed "repeated acts of mail and wire fraud, directed at numerous victims, all with the same goals (retaining clients and profits) satisfy New Jersey's pattern test."). Thus, Plaintiff's New Jersey RICO claim (Count Three) is dismissed for failure to establish a pattern of racketeering.

### D. The Fraud Claims

#### a) Common Law Fraud in the Inducement and Aiding and Abetting Common Law Fraud

Plaintiff asserts that Scott Fischer and Brian Carroll made a number of false statements which induced her to invest in the Derbyshire Project and make the loans to FIC and Byana. Those representations include: the Derbyshire Project was a "no brainer," compl. at ¶3; Plaintiff would only lose money on the investment "if 'toxic waste' or an 'oil spill' were found on the land or an 'asteroid' crashed into it," compl. at ¶4; the land for the Derbyshire Project had been obtained through a "cash purchase" and Byana owned the land "outright" and "debt free" without any encumbrances, compl. at ¶¶5,9,47, that the Derbyshire Project was a "low-risk investment," compl. at ¶58; and that FIC's "financials were 'strong'" and that default was "highly unlikely," compl. at ¶7. Plaintiff was purportedly unaware that Byana was in debt to the Fischer-related entities at the time of her investment, and contends that Defendants misled her as to the meaning of the $1.1 million advance referred to in Scott Fischer's October 9, 2006 email. Plaintiff was allegedly unaware that Byana did not own the Derbyshire Properties debt-free, and that Byana was in debt until 2010 when Scott Fischer informed Mr. Fagan that the $4 million Macon Bank loan was due and that Byana would need to pay the loan and find additional investors to repay the funds, or risk foreclosure. SOMF ¶128.

Defendants dispute that the alleged statements were made by any of the defendants, but contend that even if they were, as a matter of law, Plaintiff cannot succeed on her common-law fraud claim because the alleged fraudulent statements are 1) contradicted under the express terms of the Byana Operating Agreement, rendering Plaintiff's reliance on the statements unreasonable and 2) barred by the parole evidence rule. Def. Br. at 23. Similarly, Defendants contend that the

aiding and abetting common law fraud claims must be dismissed, because there was no fraud.  Def. Br. at 30.

A plaintiff asserting a claim of common-law fraud must establish: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereupon by the other person; and (5) resulting damages." *Triffin v. Automatic Data Processing, Inc.*, 926 A.2d 362, 368 (N.J. App. Div. 2007) (citing *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997)).  "Fraud is not presumed; it must be proven through clear and convincing evidence." *Stochastic Decisions, Inc. v. DiDomenico*, 565 A.2d 1133 (N.J. App. Div. 1989).  Generally, "the alleged fraudulent representation must relate to some past or presently existing fact and cannot ordinarily be predicated upon matters in future." *Ocean Cape Hotel Corp. v. Masefield Corp.*, 63 N.J. Super. 369, 380 (N.J. App. Div. 1960).  For example, "statements that can be categorized as 'puffery' or 'vague and ill-defined opinions' are not assurances of fact and thus do not constitute misrepresentations." *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 435 (D.N.J.), *aff'd*, 172 F.3d 859 (3d Cir. 1998).

Similarly, to establish aiding and abetting fraud under New Jersey common law, "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation." *New Jersey, Dep't of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Commc'ns Int'l, Inc.*, 904 A.2d 775, 784 (N.J. App. Div. 2006).

Here, as an initial matter, Defendants' parole evidence argument does not defeat Plaintiff's fraud claims, because Plaintiff's claim is one for fraudulent inducement.  In New Jersey, "[t]he

parole evidence rule prohibits the introduction of oral promises which tend to alter or vary an integrated written instrument." *Seidenberg v. Summit Bank*, 91 A.2d 1068, 1075 (N.J. App. Div. 2002). However, "a party to an agreement cannot, simply by means of a provision in the written instrument, create an absolute defense or prevent the introduction of parole evidence in an action based on fraud in the inducement to contract." *Walid v. Yolanda for Irene Coutoure, Inc.*, 40 A.3d 85, 94 (N.J. 2012) (quoting *Bilotti v. Accurate Forming Corp.*, 188 A.2d 24, 36 (N.J. 1963)). Although the Byana Operating Agreement provides that it "constitutes the entire agreement of the Members and their Affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written" that does not preclude Plaintiff's fraudulent inducement claim. Byana Operating Agreement, ¶10.22l; *see Walid*, 40 A.3d at 94 ("A party perpetrating a fraud may not invoke a general 'no representation' clause to preclude evidence of earlier explicit misrepresentations, if the specific facts misrepresented are peculiarly within that party's knowledge and were, in fact, intentionally misrepresented"); *McConkey v. AON Corp.*, 804 A.2d 572, 587 (N.J. App. Div. 2002)(finding that Plaintiff's fraud claim was not barred by the parole evidence rule because it was "not a case where the contract provisions contradicted oral assurances on the same subject, thereby nullifying all prior oral and written agreements between the parties."). Accordingly, the parole evidence rule does not bar Plaintiff's claims.

Here, Defendants only challenge the first and fourth elements of the fraud in the inducement analysis: whether there was "a material misrepresentation of a presently existing or past fact" and the reasonableness of Plaintiff's reliance upon the alleged misrepresentations. *Triffin*, 926 A.2d at 368. As to the first element, I find that only the alleged misrepresentations regarding the purchase of the land for the Derbyshire Project could conceivably constitute the basis for Plaintiff's fraud claim; specifically, the statements that the land for the Derbyshire Project had

been obtained through a "cash purchase" and Byana owned the land "outright" and "debt free" without any encumbrances, compl. at ¶¶5,9,47. Those statements were present statements of facts which would have been material to Plaintiff's assessment of the investment in Byana and the potentials risks posed by it. *Triffin*, 926 A.2d at 368. However, the statements that the Derbyshire Project was a "no brainer"; that Plaintiff would only lose money on the investment "if 'toxic waste' or an 'oil spill' were found on the land or an 'asteroid' crashed into it"; and that FIC was unlikely to default on its loans are not actionable as fraud because they are not "misrepresentations." Rather they constitute puffery or forward-looking statements. *See Alexander.,* 991 F. Supp. at 435 (holding that defendant's statements that contractual relationship between the parties "would be long lasting," and that the "agreement one in 'perpetuity'" were merely predictions of future events and could not form basis for a fraud claim); *VT Investors v. R & D Funding Corp.,* 733 F. Supp. 823, 838 (D.N.J.1990) (holding that statements that company in which plaintiffs invested would soon generate positive cash flow in excess of $60,000 per month characterized were not actionable misrepresentations but rather mere "puffery").

Furthermore, there is a genuine issue of material fact as to the reasonableness of Plaintiff's reliance. *Triffin*, 926 A.2d at 368. Neither the Byana Operating Agreement nor the Investment Offering expressly contradict the alleged misrepresentations that Byana was "debt free" or that the initial land purchases were funded with cash. Plaintiff acknowledges that she and her husband reviewed the Investment Offering and the Byana Operating Agreement — with Mrs. Fagan executing the latter — prior to making her initial $300,000 equity investment on November 1, 2006, and her subsequent $700,000 investment on December 26, 2006. *See* SOMF ¶¶24, 26, 56, 57, 59, 128. Both the Investment Offering and the Byana Operating Agreement repeatedly warned Plaintiff that the investment posed potential risks. Defendants contend that courts around the

country have "held that a plaintiff claiming reliance on alleged material misstatements will be charged with knowledge of warnings in the offering materials concerning the investment risks, thus making reliance unreasonable." Def. Br. at 17 (collecting cases). However, Plaintiff has not merely alleged that she was generally unaware of the risks incident to the investment, but that Scott Fischer deliberately misled her by informing her that Byana was debt-free and owned the properties free and clear. Neither the Investment Offering nor the Operating Agreement clearly state that Byana was indebted to the other Fischer-related entities at the time of Plaintiff's investment. In that regard, the Byana Operating Agreement explained that the Members desire "to form a limited liability company . . . . in order to provide a vehicle through which the Members will own the real properties which consist of approximately 180 acres of land located in Tryon, Columbus Township, Polk County, North Carolina, which land has been or will be purchased by the Company (the "Investment")," but does not indicate whether any of the properties which had been obtained or which were to be obtained would be subject to a mortgage. Thus, it does not expressly contradict Scott Fischer's assertions that Byana owned the Derbyshire properties "debt free." Accordingly, his representations were not expressly contradicted by either document.

On the other hand, there is some evidence in the record from which Plaintiff could have gleaned Mr. Fischer's representations were untrue. The Investment Offering indicates that Private Capital was seeking both debt and equity investors, and that the purchase of the land for the project could "be achieved on a leveraged or un-leveraged basis" and evidence of the mortgage on 133.63 acres of the parcels owned by Byana was recorded in the Polk County Register of Deeds which is available online. SOMF ¶¶18, 29; *see also* Investment Offering. Further, the Byana Operating Agreement also noted that Private Capital, as Byana's manager, had the unfettered right to encumber the property as necessary. SOMF ¶36. However, whether these statements were

sufficient to place Plaintiff on notice that Byana was not in fact "debt free," such that Plaintiff's reliance on Scott Fischer's representations was unreasonable, is a question of fact. Since there are disputed issues of material fact relating to the reasonableness of Plaintiff's reliance and whether Defendants made material misrepresentations of presently existing or past facts, Defendants' Motion for summary judgment as to the common-law fraud claim (Counts VI) is denied. Furthermore, since Defendants' only argument in support of summary judgment on the aiding and abetting common law fraud claim is that there was no fraud, Defendants' motion on that claim (Count VII) claims is denied, as well.[9]

### b) Equitable Fraud

Defendants' arguments in favor of summary judgment on Plaintiff's equitable fraud claim largely mirror their arguments as to dismissal of the common law fraud claims: that Plaintiff's reliance on Defendants' misrepresentations was unreasonable, in light of the language of the Byana Operating Agreement. Def. Br. at 31-32. Moreover, Defendants contend that Plaintiff should not be permitted to rely on an equitable doctrine, because Plaintiff misrepresented her experience in the Investor Questionnaire, and thus, Plaintiff has unclean hands. *Id*.

In New Jersey, a claim of equitable fraud requires proof of: (1) a material misrepresentation of a presently existing or past fact; (2) the maker's intent that the other party rely on it; and (3) detrimental reliance by the other party. *Jewish Ctr. of Sussex Cty. v. Whale*, 432 A.2d 521, 524 (N.J. 1981) (citation omitted). Unlike a claim for legal fraud, there need not be proof that the statement was made with knowledge that it was false. *Id*. However, as a general rule, the

---

[9] Summary judgement on the fraud claims is denied only as to defendants Scott Fischer, Brian Carroll, Byana, FIC, and Private Capital. For reasons discussed more fully later in this Opinion, all claims against defendants Veronika Fischer, Funder, Bowder, and Wealth Capital are dismissed.

application of equitable principles "follows the common law precept that no one shall be allowed to benefit by his own wrongdoing. Thus, where the bad faith, fraud or unconscionable acts of a petitioner form the basis of his lawsuit, equity will deny him its remedies." *Rolnick v. Rolnick,* 674 A.2d 1006, 1011 (N.J. App. Div. 1996). Furthermore, "[a]s an equitable doctrine, application of unclean hands rests within the sound discretion of the trial court." *In re New Valley Corp.*, 181 F.3d 517, 525 (3d Cir. 1999).

It is well-recognized that "[i]n an action for equitable fraud, the only relief that may be obtained is equitable relief, such as rescission or reformation of an agreement and not monetary damages." *Enright v. Lubow*, 493 A.2d 1288, 1296 (N.J. App. Div. 1985); *see also Daibo v. Kirsch*, 720 A.2d 994, 998 (N.J. App. Div. 1998)(reversing trial court's grant of money damages for equitable fraud claim); *Luong v. Nguyen*, No. A-1450-09T3, 2011 WL 1376316, at *9 (N.J. App. Div. Apr. 13, 2011)(affirming the dismissal of plaintiff's equitable fraud claim because plaintiff sought "only monetary damages, which are not permitted in a successful equitable fraud claim"). Here, Plaintiff's complaint expressly seeks money damages, which are not permitted in an equitable fraud action. *See* Compl. Count VIII (seeking damages "for an exact amount to be determined at trial, but in any event, at least $2,000,000.00, together with prejudgment interest, reasonable attorneys' fees and costs, punitive damages, and for all other relief this Court finds just and equitable."). Accordingly, Defendants' motion for summary judgment on the equitable fraud claim (Count VIII) is granted.

### E. Conversion

Defendants contend that Plaintiff's conversion claim is precluded due to the existence of a contractual relationship between Plaintiff and Defendants. Def. Br. at 48. The common law tort of conversion in New Jersey is defined as the "intentional exercise of dominion or control over a

chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Chicago Title Ins. Co. v. Ellis*, 978 A.2d 281, 287 (N.J. App. Div. 2009), *cert. denied*, 983 A.2d 1113 (N.J. 2009). While conversion was "originally intended to protect title to chattels, conversion today may be applied to money, bonds, promissory notes, and other types of securities, as long as the plaintiff has an actual interest in the security and it is capable of misuse in a way that would deprive the plaintiff of its benefit." *Cargill Glob. Trading v. Applied Dev. Co.*, 706 F. Supp. 2d 563, 578 (D.N.J. 2010). However, in order "to prevent breach of contract claims from turning into tort claims," the application of the doctrine is generally limited to situations "where there is an obligation to return 'the identical money' . . . it does not lie where there is merely a debtor/creditor relationship." *Id.* (quoting *Advanced Enterprises Recycling, Inc. v. Bercaw*, 869 A.2d 468, 473 (N.J. App. Div. 2005); *Scholes Elec. & Commc'ns, Inc. v. Frasor*, No. 04–3898, 2006 WL 1644920, at \*5 (D.N.J. 2006) ("When money, as opposed to tangible property, is the subject of a conversion claim, New Jersey courts require that a plaintiff show something more than a contractual obligation on the part of a defendant to pay the plaintiff to establish conversion."). Additionally, the converted funds must be identifiable, and the injured party must establish that the tortfeasor exercised dominion over the money and repudiated the superior rights of the owner. *Id.*

Here, Plaintiff alleges that Defendants' interference deprived her of the possession or use of personal property in the form of the $2,250,000.00 debt and equity investments in Byana and FIC. Compl. ¶229. In Plaintiff's view, Defendants are liable for conversion because the money Plaintiff wired to Byana came out of the entity and was transferred to other Fischer-related entities for Scott Fischer's benefit. Pl. Br. at 32. Furthermore, Plaintiff relies on *Federal Ins. Co. v. Smith*, 63 F. App'x. 630, 635 (4th Cir. 2003), an out-of-circuit, unreported opinion, in support of her

argument that "Veronika Fischer is properly subject to direct liability for conversion and other claims" even though Mrs. Fischer never interacted with Plaintiff or her husband during the course of their investment. *Id*.

The relationship between the parties is governed purely by contract. This is not an instance where Defendants exercised unauthorized dominion over the property of another. Rather, Plaintiff voluntarily tendered funds to Byana, and FIC pursuant to the Byana Operating Agreement and the Promissory Notes. *c.f. First Am. Title Insurace Co. v. Sadek*, No. 11-1302, 2017 WL 6663899, at *5 (D.N.J. Dec. 29, 2017) (granting summary judgment in favor of plaintiff on conversion claim where defendants received proceeds from sale of mortgaged property, and did not utilize sale proceeds to repay balance of outstanding mortgage but rather deposited and retained funds in their own bank account); *Am. Rubber & Metal Hose Co.*, No. 11-1279, 2011 WL 3022243, at *6–7 (D.N.J. July 22, 2011) (dismissing conversion claim where "the alleged failure to fulfill the requirements of the purchase of said assets sounds in contract, not tort."). As such Plaintiff's conversion claim fails. To the extent Plaintiff claims that Defendants never intended to 1) re-pay Plaintiff for the promissory notes, 2) pay to Plaintiff dividends from her equity investment in Byana, or 3) manage Byana such that Plaintiff's investment would provide returns, the appropriate mechanism for seeking relief lies in Plaintiff's fraud and breach of contract claims, not in a conversion action.

Furthermore, *Smith*, upon which Plaintiff relies is distinguishable. There, a wife received funds that her husband had obtained by fraud, and the Fourth Circuit, applying Virginia law, held that the wife, a third-party who personally benefitted from converted funds without knowledge of the fraud, could be liable for conversion. 63 F. App'x at 635. As an initial matter, the *Smith* court was interpreting Virginia law and Plaintiff has not proffered any case law suggesting that a New

Jersey court would interpret New Jersey law in a similar fashion. Furthermore, Plaintiff has not pled a theory of conversion premised on the receipt of fraudulently obtained funds. Rather, Plaintiff's Complaint clearly alleges that "Defendants [including Mrs. Fischer] intentionally interfered with Plaintiffs' monies and exercised dominion and control over those monies," and, importantly, it does not allege that Plaintiff is seeking to hold Mrs. Fischer liable for conversion based, simply, on the receipt of funds fraudulently obtained by her husband. Compl. ¶228. And, Plaintiff cannot now amend her complaint in her briefing. *See Coles v. New Jersey Dep't of Human Servs.*, No. 13-3987, 2014 WL 2208142, at *8 (D.N.J. May 28, 2014)("Arguments made in briefing cannot amend the pleadings.").

Additionally, even if Plaintiff had pled a *Smith* theory of conversion, it is unclear whether Mrs. Fischer actually received any of Byana's funds, as the funds, unlike in *Smith*, were not transferred to her directly. Rather, funds from Byana were transferred to defendant entities -- FIC, Funder, and Private Capital -- in which Mrs. Fischer owns an interest. Mrs. Fischer currently has a 90% membership interest in Funder and owns 51% of FIC. SOMF ¶9-10. Her ownership stake in the companies has increased significantly over the years. Mrs. Fischer owned 0% of FIC from 2006 through 2009, when Mrs. Fagan initially invested in the Byana, and 51% from 2010 through the present. SOMF ¶9. Mrs. Fischer owned 1% of Funder from 2006 through 2009, 60% in 2010, 72% from 2011 through 2014, and 90% from 2015 to the present. SOMF ¶4 Funder, in turn, has ownership stakes in Private Capital and Bowder, which are both members of Byana. ECF No. 125, Plaintiff's Supplemental Statement of Disputed Fact ("Pl. Supp. SOF.") ¶¶12; SOMF ¶¶ 6-7. Furthermore, Mrs. Fischer also receives a salary from FIC. Pl. Supp. SOF. at ¶15. The parties dispute whether Byana had a legitimate basis for transferring funds to the Fischer-related entities and whether Mrs. Fischer was a bona-fide employee of FIC. However, Plaintiff has not submitted

evidence to show that any of the transferee entities, were devoid of funds of their own, such that any funds from those entities that made their way to Mrs. Fischer, in the form of a salary or otherwise, are clearly traceable to the alleged fraudulent funds acquired by Mr. Fischer.  As the *Smith* court, itself, noted "[i]n order to recover in conversion for money that has changed forms, . . . the proceeds must be traceable to the original conversion." *Smith*, 63 F. App'x at 633.  Because Plaintiff cannot show that there was such a transfer, the Court grants summary judgment in favor of Defendants on Plaintiff's conversion claim (Count IX).

### F.     Unjust Enrichment

Plaintiff alleges that Defendants were unjustly enriched by the retention of her $2,250,000.00 debt and equity investments in Byana and FIC, in light of their alleged illegal acts. *See* Compl ¶¶231-237.  Defendants contend that Plaintiff's "claim for unjust enrichment fails as a matter of law because there was a binding contractual relationship between Plaintiffs and Defendants pursuant to the Operating Agreement."  Def. Br. at 49.  Plaintiff contends that it only had a direct contractual relationship with Byana, thus,  regardless of the contractual agreements, it may allege an unjust enrichment claim as to the other defendants because they were not parties to the Byana Operating Agreement or the FIC and Byana Promissory Notes.  Pl. Br. at 33.

To establish a claim for unjust enrichment, a plaintiff must prove that (1) at plaintiff's expense; (2) defendant received benefit; (3) under circumstances that would make it unjust for defendant to retain said benefit without paying for it. *Maniscalco v. Brother Intern. Corp. (USA)*, 627 F. Supp. 2d 494, 505 (D.N.J. 2009).  Retention of a benefit without payment is not unjust unless "the plaintiff expected remuneration from the defendant, or if the true facts were known to plaintiff, he would have expected remuneration from defendant, at the time the benefit was conferred."  *Assocs. Comm. Corp. v. Wallia*, 511 A.2d 709, 711 (N.J. App. Div. 1986) (quoting

*Callano v. Oakwood Park Homes Corp.*, 219 A.2d 332, 335 (N.J. App. Div. 1966)). Thus, unjust enrichment cases "involve[] either a direct relationship between the parties or a mistake on the part of the person conferring the benefit." *Fasching v. Kallinger*, 211 510 A.2d 694, 700 (N.J. App. Div. 1986).

"Unjust enrichment is not an independent theory of liability, but is the basis for a claim of quasi-contractual liability." *Goldsmith v. Camden Cty. Surrogate's Office*, 408 N.J. Super. 376, 382 (N.J. App. Div. 2009) (citation and internal quotation marks omitted). "Because unjust enrichment is an equitable remedy resorted to only when there was no express contract providing for remuneration, a plaintiff may recover on one or the other theory, but not both." *Caputo v. Nice–Pak Prod., Inc.*, 693 A.2d 494, 499 (N.J. App. Div. 1997); *see Amgro, Inc. v. Lincoln Gen. Ins. Co.*, 361 F. App'x 338, 346 (3d Cir. 2010) (affirming summary judgment of the plaintiff's unjust enrichment claim, where an express contract governed the parties' relationship); *Simonson v. Hertz Corp.*, No. 10–1585, 2011 WL 1205584, at *6 (D.N.J. Mar. 28, 2011) ("[A] plaintiff may not recover on both a breach of contract claim and an unjust enrichment claim ....").

Here, Plaintiff cannot succeed on her unjust enrichment claims against FIC and Byana, because the allegedly unjust remuneration obtained by Defendants was proffered by Plaintiff pursuant to the Byana Operating Agreement and the FIC and Byana Promissory Notes. Plaintiff alleges that Defendants have been unjustly enriched by virtue of the $1 million investment in the Derbyshire project, and the $1.25 million loans to Byana and Fischer Capital. Compl. ¶240. Thus, Plaintiff's claim for unjust enrichment stems entirely from the contractual relationships between Plaintiff, Byana, and Fischer Capital. A party cannot state a claim for unjust enrichment where a contract expressly covers the dispute between the parties. *See Amgro*, 361 F. App'x at 346; *Caputo*, 693 A.2d. at 499; *Simonson*, 2011 WL 1205584 at *6.

Plaintiff's unjust enrichment claims against the other defendants fails as well. The requirement that a plaintiff must confer a benefit on the defendant "has been interpreted by New Jersey courts as a requirement that 'the plaintiff allege a sufficiently direct relationship with the defendant to support the claim.' " *Snyder v. Farnam Companies, Inc.,* 792 F. Supp. 2d 712, 724 (D.N.J. 2011) (quoting *Nelson v. Xacta 3000 Inc.,* No. 08–5426, 2009 WL 4119176, at *3 (D.N.J. Nov. 24, 2009)). Here, Plaintiff wired her funds to Scott Fischer on behalf of FIC and Byana, respectively. Plaintiff did not have any direct relationship with any of the other defendants, at the time she made her investments. Neither did Plaintiff directly confer a benefit upon the other defendants, and thus, she cannot sustain an unjust enrichment claim against them. *Dzielak v. Whirlpool Corp.*, 26 F. Supp. 3d 304, 330 (D.N.J. 2014) (dismissing "unjust enrichment claim as against [the manufacturer] only, because the [p]laintiffs conferred no direct benefit on [the manufacturer]" where product was purchased from retailer); *Snyder*, 792 F. Supp. 2d at 724 (dismissing unjust enrichment claim because plaintiffs "failed to allege that they purchased the Products directly from [d]efendants, they cannot rightfully expect any remuneration from [d]efendants, since they never directly conferred a benefit on [d]efendants."). Accordingly, Defendants' motion for summary judgment on the unjust enrichment claims (Count XI) is granted.

## G. Breach of Fiduciary Duty

Count XIV of Plaintiff's Complaint alleges a breach of fiduciary duty by Defendant Scott Fischer. Defendant has moved for summary judgment on the breach of fiduciary duty claim, contending that it is barred by the terms of the Byana Operating Agreement. Def. Br. at 45.

To prove a breach of fiduciary duty, the plaintiff must prove: (1) a fiduciary relationship existed between the parties, (2) a breach of the duty imposed by that relationship, and (3) harm to

the plaintiff.  *ACE Am. Ins. Co. v. Wachovia Ins. Agency Inc.*, No. 08–4369, 2008 WL 4630486, at * 6 (D.N.J. Oct. 17, 2008) (citing *McKelvey v. Pierce*, 800 A.2d 840, 859–60 (N.J. 2002)).

Here, the critical inquiry is whether there was a fiduciary relationship between Plaintiff and Scott Fischer.  The Court finds that the Byana Operating Agreement expressly disclaims the existence of any fiduciary duties between its members, thus that document cannot form the basis for Plaintiff's alleged fiduciary relationship with Scott Fischer.  Because Byana is a Delaware LLC, Delaware law[10] applies to the interpretation of the entity's formation document and whether the Byana Operating Agreement gave rise to a fiduciary relationship between the parties.  *Fagin v. Gilmartin,* 432 F.3d 276, 282 (3d Cir. 2005) ("Under New Jersey's choice-of-law rules, the law of the state of incorporation governs internal corporate affairs.").

Under Delaware law, an LLC agreement may eliminate or limit liability for breach of fiduciary duties by the members or managers. 6 Del. C. § 18-1101(e)("A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement[.]").  Here, the Byana Operating Agreement includes such a waiver:

> To the fullest extent permitted by the Act, the Members: (i) acknowledge their intention to be governed solely by the contractual rights and obligations set forth in this Agreement; and (ii) as an

---

[10]  Furthermore, as previously discussed, the Byana Operating Agreement contains a choice-of-law provision that provides for its interpretation under Delaware law.  To the extent Plaintiff's fiduciary duty claim is based on the Byana Operating Agreement, Delaware law applies; however, consistent with New Jersey's choice of law rules, and because the parties have not suggested that there is any difference between New Jersey or Delaware law on this issue, the Court will apply New Jersey law to the analysis of whether Scott Fischer owed Mrs. Fagan a fiduciary duty independent from that imposed by the Byana Operating Agreement or their joint membership in Byana.

> inducement to the Manager to permit their admission to the Company, hereby waive any claim of fiduciary duties arising from the relationships between the Members (including the relationships between the Manager and the non-Managers) created by this Agreement.

Byana Operating Agreement, Section 4.8, Waiver of Fiduciary Duty. Thus, the Byana Operating Agreement expressly disclaims the existence of a fiduciary duty between Plaintiff and Scott Fischer. Accordingly, to the extent Plaintiff's fiduciary duty argument is based on Scott Fischer's status as a member of Byana, Plaintiff's breach of fiduciary duty claim fails as a matter of law.

Plaintiff also appears to contend that Scott Fischer owed her a fiduciary duty, separate and apart from any obligations they owed to each other as members of Byana, because "Mr. and Mrs. Fagan . . . relied upon Scott Fischer to give them investment advice." Pl. Br. at 25. Accordingly, the Court must analyze, under New Jersey law, whether Scott Fischer owed Mrs. Fagan an independent fiduciary duty.

"A fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship." *F.G. v. MacDonell*, 696 A.2d 697, 704 (N.J. 1997). A hallmark of a fiduciary relationship is one party's placement of "trust and confidence in another." *Big M, Inc. v. Dryden Advisory Group*, No. 08–3567, 2009 WL 1905106, at *24 (D.N.J. June 30, 2009) ("A fiduciary obligation exists whenever one person places special trust and confidence in another person upon whom the person relies to exercise discretion and expertise upon behalf of that person"). Typically, one side in a fiduciary relationship has a "dominant and controlling position" that prevents the parties from dealing on equal terms. *Alexander,* 991 F. Supp. at 437. In other words, a fiduciary relationship "does not exist where the parties deal on terms of equality." *Id*. (quoting *In re Stroming's Will*, 79 A .2d 492, 495 (N.J. App. Div. 1951)).

Here, there is no indication from the interactions between Plaintiff (or her husband, who did much of the negotiating regarding the investment) and Scott Fischer that the parties' relationship was characterized by trust or confidence, or that they were unable to compete on equal terms.[11] Scott Fischer provided the Fagans with information about a potential investment, and three weeks later, with ample time to seek advice from others, if the Fagans so desired, Plaintiff chose to invest in Byana. The hallmarks of a fiduciary relationship are notably absent here; this was nothing more than a business transaction between the parties, which generally precludes a finding of a fiduciary relationship. *See Alexander*, 991 F. Supp. 427, 438 ("fiduciary duties are not imposed in ordinary commercial business transactions.").

Plaintiff's deposition testimony that she "trusted" Scott Fischer and "relied" on him is insufficient to transform the business transaction at issue into a fiduciary relationship. *See e.g., Shogen v. Glob. Aggressive Growth Fund, Ltd.*, No. 04-5695, 2007 WL 2264978, at *4 (D.N.J. Aug. 3, 2007)(finding that "plaintiff's deposition testimony after the fact that she relied on

---

[11] While the parties have not explained, in this motion, how the Fagans came to meet Scott Fischer or the exact nature of the relationship between the parties, it appears that Scott Fischer is a friend of Mr. Fagan's brother-in-law. *See* M. Fagan Dep. 254:3 to 254:24; 257:23 to 259:24 (explaining that Mr. Fagan reached out to Scott Fischer directly, introduced himself as Ted Sedelmaier's brother–in–law, and stated that he was interested in speaking to Scott Fischer about his business ventures). However, it is unclear whether Plaintiff and Scott Fischer were friends, and in that regard, Plaintiff has not argued that she had a personal connection with Scott Fischer such that Scott Fischer owed Plaintiff a fiduciary duty on that basis. Regardless, a friendly or collegial relationship with an individual – absent indicia of "trust and confidence" and an expressed intent to rely on the fiduciary's advice – does not give rise to a fiduciary relationship. *Big M, Inc.,* No. 08–3567, 2009 WL 1905106, at * 24 ("A fiduciary obligation exists whenever one person places special trust and confidence in another person upon whom the person relies to exercise discretion and expertise upon behalf of that person"); *see e.g., Crestwood Farm Bloodstock v. Everest Stables,* Inc., 751 F.3d 434, 443 (6th Cir. 2014)("That the two were friends, even close friends, may well explain why they did business together. Many friends do business together. But not all friends are fiduciaries."); *Stinnett v. Colorado Interstate Gas Co.,* 227 F.3d 247, 253 (5th Cir. 2000)("Fiduciary duties do not abound in every, or even most, arms-length contractual relationships, even those among trusting friends.")

defendants' advice does not constitute sufficient evidence that she expressly reposed a trust and confidence in them at the time she was seeking a stock pledge loan" thus defendants were entitled to summary judgment on plaintiff's claim for breach of fiduciary duty). Furthermore, there is no indication that Scott Fischer was aware, or had reason to know, of Plaintiff's professed reliance on him. To the contrary, in signing the Byana Operating Agreement, Plaintiff attested that she "ha[d] not relied in [sic] any representations or warranties of the Company, the Manager, any Affiliate thereof or any officer, employee or agent of any of the foregoing with respect to the value of the interests of the Company." Byana Operating Agreement. Additionally, the investment materials, provided by Scott Fischer, encouraged Plaintiff to seek counsel from "accountants, attorneys and tax advisors" to act as fiduciaries to Plaintiff. *See* Investment Offering. A fiduciary relationship cannot be created via one party's unilateral and unexpressed belief that such a relationship exists. *Vent v. MARS Snackfood US, LLC*, 350 F. App'x 533, 535 (2d Cir. 2009)("fiduciary or confidential relationships also require both parties' agreement. A fiduciary relationship cannot be created unilaterally when one person entrusts another with confidential information."); *see also Shogen*, No. 04-5695 SRC, 2007 WL 2264978, at *4 (noting that there was "no evidence here that the [defendants] knew that Plaintiff would rely on them and follow their advice. Rather, Defendants testified that they believed Plaintiff would be acting with counsel on her own behalf. Plaintiff never told them otherwise and has not pointed to any testimony indicating her reliance by stating, for instance, that she told the [defendants] that she would rely on their advice."). Apart from her professed reliance on Mr. Fischer, Plaintiff has not pointed to evidence suggesting that he was in a "dominant and controlling position" over Plaintiff during the investment discussions.

Accordingly, Plaintiff has not demonstrated that she had a fiduciary relationship with Scott Fischer, and thus, she cannot succeed on her claim for breach of fiduciary duty. The motion for summary judgment on the breach of fiduciary duty claim (Count XIV) is granted.

**H.     Breach of Contract**

Plaintiff alleges that Defendants Scott Fischer, Byana, and FIC have breached the terms of the Byana and FIC Promissory Notes. *See* Compl. ¶¶243-251. In support of her claims against Scott Fischer, Plaintiff relies on a piercing the corporate veil theory arguing that Scott Fischer was the alter ego of Defendants Byana and FIC, by misusing their corporate forms and freely transferring funds between the entities, and thus he is personally liable on the Promissory Notes. *Id*. In that regard, Plaintiff contends that there are disputed material facts as to whether Scott Fischer was the alter ego of Byana and FIC, and that her piercing the corporate veil theory has "only gained support through discovery." Pl. Br. at 34.

Defendant Scott Fischer argues that because he was not a signatory to the notes, they were solely corporate obligations. Def. Br. at 50. Scott Fischer contends that since Plaintiff has not identified the legal authority on which she relies, or the factual evidence which would support a piercing the corporate veil theory of liability, Plaintiff's breach of contract claims against Scott Fischer should be dismissed. Def. Reply. Br. at 23.

Each of the FIC Promissory Notes was signed by "K. Scott Fischer" in his capacity as president of FIC. *See* Fischer Cert, Exs. V, W, X. The Byana Promissory Notes were signed by "K. Scott Fischer" in his capacity as a member of Byana LLC. *See* Fischer Cert, Exs, Z, AA. Accordingly, Defendant contends that because Scott Fischer signed the notes solely in his capacities as the President of FIC, and a member of Byana, he cannot be held personally liable on the notes. Def. Br. at 52. While Defendant's contentions are true as to the initial Promissory

Notes, the FIC Loan Modification Agreement entered into on January 5, 2009, which modifies the July 30, 2007 and April 30, 2007 FIC Loans, list "Kevin S. Fischer" as a "Guarantor".[12]  *See* Fischer Cert., Exs. BB, CC.  Accordingly, there is a genuine dispute of material fact as to whether Scott Fischer is personally liable on the FIC Promissory Notes, and the Court will allow the breach of contract claim against Scott Fischer to proceed as to the FIC Promissory Notes.

In contrast, neither the Byana Promissory Notes, nor the Byana Loan Modification Agreements, designate Scott Fischer, or anyone else, as a guarantor.  Accordingly, for Plaintiff to hold Scott Fischer personally liable on the Byana Promissory Notes, Plaintiff must rely on a piercing the corporate veil theory of liability.

Under New Jersey law[13], two elements must be shown to pierce the corporate veil: "First, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist.  Second, the circumstances must indicate that adherence to the

---

[12]  Presumably "K. Scott Fischer" and "Kevin S. Fischer" both refer to Defendant Scott Fischer.

[13]  Neither party has conducted a choice of law analysis as to Plaintiff's piercing corporate veil claim.  Although the Byana Promissory Notes provide that the Agreement is to be governed by the laws of the State of North Carolina, *see* Fischer Cert, Exs, Z, AA, the choice of law provision does not determine which state's law applies to the piercing the corporate veil analysis.  *Dassault Falcon Jet Corp. v. Oberflex, Inc.*, 909 F. Supp. 345, 348 (M.D.N.C. 1995)("a choice of law provision in a contract is not binding on what law to apply for piercing the corporate veil. The reason for this is that the issue of piercing the corporate veil is collateral to and not part of the parties' negotiations or expectations with respect to the contract."); *see also Linus Holding Corp. v. Mark Line Indus.*, LLC, 376 F. Supp. 3d 417, 424 (D.N.J. 2019)(explaining that courts within this district often look to "the state that has the most significant connection with the parties and the transaction" in order to determine which state's law governs the piercing the corporate veil analysis).  Accordingly, the veil-piercing analysis may be governed by either Delaware, where Byana was formed; New Jersey, where Scott Fischer and Plaintiff both reside,  or North Carolina law.  Nonetheless, because the parties have not addressed the matter, and New Jersey's veil-piercing framework is substantially similar to that of North Carolina and Delaware, the Court will apply New Jersey law. *See e.g.*, *Linus Holding Corp.*, 376 F. Supp. at 424 (applying New Jersey law to veil-piercing claim because "New Jersey's veil-piercing framework is substantially similar to the veil-piercing framework under the laws of Florida and Utah").

fiction of separate corporate existence would sanction a fraud or promote injustice." *State Capital Title & Abstract Co. v. Pappas Bus. Servs., LLC,* 646 F. Supp. 2d 668, 679 (D.N.J. 2009) (quotations and citations omitted). However, even in instances where one individual shareholder or director dominates the corporate entity, "liability generally is imposed only where the [dominant party] has abused the privilege of incorporation by using the [corporate form] to perpetrate a fraud or injustice, or otherwise to circumvent the law." *State Dept. of Environmental Protection v. Ventron Corp.*, 468 A.2d 150, 165 (N.J. 1983). In determining whether a unity of interest and ownership exists under the first prong, the Third Circuit, applying New Jersey law, has utilized six non-binding factors to guide this inquiry: "[1] gross undercapitalization . . .; [2] the failure to observe corporate formalities, non-payment of dividends, [3] the insolvency of the debtor corporation at the time, [4] siphoning of funds of the corporation by the dominant stockholder, [5] non-functioning of other officers or directors, absence of corporate records, and [6] the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders." *Linus Holding Corp. v. Mark Line Indus., LLC*, 376 F. Supp. 3d 417, 425 (D.N.J. 2019)(quoting *Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 150 (3d Cir. 1988) (citations omitted). Ultimately, "the party seeking an exception to the fundamental principle that a corporation is a separate entity from its principal bears the burden of showing that the court should disregard the corporate entity." *Tung v. Briant Park Homes, Inc.*, 670 A.2d 1092, 1096 (N.J. App. Div. 1996).

In *Linus Holding Corporation*, the plaintiff, a real estate developer, brought suit against a LLC, with which it had contracted, and sought to pierce the corporate veil of the company in order to exercise personal jurisdiction over affiliated entities and officers of the company. 376 F. Supp. 3d at 427. The plaintiff alleged that the defendant-entity had transferred funds, totaling $1.5 million, to affiliated entities, rendering the defendant entity "undercapitalized" and that the

individual officers served in a managerial capacity over both the defendant entity and its affiliates; those facts, plaintiff alleged, were sufficient to support piercing. *Id.* The court declined to pierce the corporate veil, finding that plaintiff's allegations were insufficient to demonstrate an alter ego relationship between the defendant entity and its affiliates or the officers. *Id.* As an initial matter, the court explained that "common ownership and common management alone are insufficient for veil-piercing purposes," particularly in the context of an LLC, because such entities "are 'deliberately provided with 'organizational flexibility.'" *Id.* (quoting *Coty US LLC v. 680 S. 17th St. LLC*, No. 122-13, 2015 WL 1011664, at *15 (N.J. App. Div. Feb. 26, 2015). Furthermore, the court noted that the defendant entity "maintained its own financial statements, [o]perating [a]greement, hired employees, and filed separate tax documents. Thus, [p]laintiff's allegations do not adequately demonstrate that [the defendant entity] functioned as a dummy or shell corporation." *Id.* at 428. The court also rejected plaintiff's contention that the company's insolvency was indicative of undercapitalization, as the inquiry into whether a company is undercapitalized is "'highly factual and may vary substantially with the industry, company, size of the debt, account methods employed, and like factors,'" and plaintiff had not alleged any information regarding the appropriate level of capital for a business of defendant's size in the same industry. *Id.* at 426 (quoting *Trs. of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 197 (3d Cir. 2003)). Ultimately, the court concluded that "[a]t best, [p]laintiff's allegations demonstrate[d] a misuse or mismanagement of corporate funds that ultimately resulted in [defendant entity's] inability to sustain its business operations," rather than the type of "specific, unusual circumstances" which are required for veil-piercing purposes." *Id.* at 429.

Here, Plaintiff has provided nothing but conclusory allegations that Defendant Scott Fischer "misused the corporate form in failing to observe corporate formalities in managing Defendants Byana and [FIC]" and "operated Defendants Byana and Fischer Investment Capital from his home address and used numerous bank accounts to transfer funds freely between and among Defendants Byana and Fischer Investment Capital, together with various other Fischer-related entities." Compl. ¶¶239-246.

The record currently before this Court indicates that Byana made approximately $900,000 in transfers to the Fischer-related entities as follows[14]: in early December 2006, two wire transfers of $150,000.13 and $100,000 were made from Byana to FIC, SOMF ¶90; and on December 26, 2006, the same day as Tina Fagan's second equity investment of $700,00, a wire transfer of $650,000 was made from Byana to FIC, SOMF ¶93; on April 1, 2009, land was transferred to Private Capital pursuant to an installment sale, SOMF ¶98.

The parties dispute the purpose of the transfers; Plaintiff contends that they were fraudulent conveyances, while Mr. Fischer contends that they were repayments for the "$1 million advance" which the Fischer-related entities made to Byana in order for Byana to purchase the properties upon which the Derbyshire Project would be built. Irrespective of the legitimacy of the transfers, as the court explained in *Linus Holding Corp.*, the mere showing that the related-entities received transfers of funds from Byana is insufficient to satisfy the first prong of the veil-piercing inquiry[15].

---

[14] Plaintiff has not disputed the existence of these transfers or that they were made to Fischer-related entities rather than Mr. Fischer himself, however, Plaintiff disputes the facts "to the extent Defendants suggest they acted legitimately." Pl. Resp. SOMF ¶¶81-97.

[15] While the inter-company transfers, alone, cannot satisfy the alter-ego inquiry, the transfers, in light of the dispute as to their legitimacy, suggest that "adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice," arguably satisfying the second, but not the first, prong of the piercing corporate veil analysis. *State Capital Title & Abstract Co. v. Pappas Bus. Servs.*, 646 F. Supp. 2d at 679.

Plaintiff, after years of discovery, has not provided documentary support, aside from bank records evidencing various transfers between the entities, for her alter ego theory. 376 F. Supp. 3d at 427 (refusing to pierce the corporate veil because even assuming alleged transfers constituted a disregard of corporate formalities, the plaintiff otherwise failed to demonstrate the presence of any of the other factors relevant to a veil-piercing analysis). Instead, Plaintiff conclusorily asserts that her allegations have "only gained support through discovery." Pl. Br. at 34. But Plaintiff has not cited any authority to stand for the proposition that the mere transfer of funds amongst related entities is a sufficient basis to pierce the corporate veil; nor has Plaintiff demonstrated that Byana was undercapitalized at its inception, or any of the other alter ego factors. Moreover, Plaintiff has not proffered evidence indicating that any of the funds were transferred to Mr. Fischer's personal bank accounts. Indeed, Mr. Fischer's common ownership in those entities, and entities' common headquarters, is insufficient to justify piercing. *Compare Preferred Real Estate Invs., LLC v. Lucent Techs., Inc.*, No. 07-5374, 2009 WL 1748954, at *4 (D.N.J. June 19, 2009) (declining to pierce the corporate veil where plaintiff merely alleged "common ownership," a "common place of business," between defendant entity and related entities and that principals of other entities utilized personal funds to facilitate the defendant entity's purchase of properties and noting that provision of funds "may simply be an investment") *with Operative Plasterers & Cement Masons Int'l Ass'n Local 8 v. AGJ Const., LLC*, No. 08-6163, 2009 WL 2243900, at *7 (D.N.J. July 24, 2009)(finding piercing the corporate veil appropriate to hold individual defendants liable where plaintiff alleged that corporation was undercapitalized, and failed to observe corporate formalities or maintain corporate records). In short, Plaintiff's allegations fall short of establishing that Scott Fischer disregarded Byana's corporate form such that "the corporation is merely a facade." *Linus Holding Corp.*, 376 F. Supp. 3d at 425.

Accordingly, summary judgment is granted, as to the claim of breach of the Byana Promissory Notes against Scott Fischer only. However, Plaintiff's breach of contract claim as to the FIC promissory notes may proceed, as Scott Fischer appears to have personally guaranteed the FIC Loan Modification agreement.[16]

## I. Dismissal of Defendants Veronika Fischer, Funder, Bowder and Wealth Capital

Defendants Veronika Fischer, Funder, Bowder, and Wealth Capital contend that they are entitled to summary judgment on all of Plaintiff's claims. Def. Br. at 46-48  In support of their argument, Defendants contend that, as to the entity defendants, Plaintiff and her husband testified at their depositions, that they did not know what these entities were or what their relationship is to Scott Fischer and Byana. Def. Br. at 47.  As to Mrs. Fischer, Defendants contend that Plaintiffs have failed to proffer any evidence suggesting her involvement in the alleged fraudulent scheme, and that Plaintiffs do not know, and have never spoken to Mrs. Fischer.  Def. Br. at 46.

Plaintiff's only remaining claims, against these defendants, are the common law fraud, and aiding and abetting common law fraud claims.  As outlined in this Opinion, in order to succeed on a claim of common law fraud, a plaintiff must establish "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereupon by the other person; and (5) resulting damages." *Triffin*, 926 A.2d at 368.  In order to succeed on a claim for aiding and abetting fraud, a plaintiff must establish "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part

---

[16]  In addition to the claim against Scott Fischer, Count XI also alleges breach of contract claims against Byana and FIC. *See* Compl. ¶¶238-246. Those defendants did not move for summary judgment on that count. Accordingly, the breach of contract claims against Byana and FIC proceed.

of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation." *State, Dep't of Treasury*, 904 A.2d at 784.

Here, Plaintiff has pointed to nothing more than common-ownership between some of the defendant entities, and the receipt of funds from Byana. That is insufficient. As discussed in this Opinion, Mrs. Fischer had an ownership stake in Funder, an entity which has ownership stakes in Private Capital and Bowder, and funds from Byana were transferred to those entities. Furthermore, Mrs. Fischer received a salary from FIC. The parties dispute the purpose and legitimacy of the transfers and the propriety of Mrs. Fischer's salary, but undisputedly the record shows that the transfers and payments were initiated and orchestrated by Mr. Fischer. Indeed, Plaintiff has not proffered any evidence suggesting that Mrs. Fischer or those entities had any direct involvement in the alleged fraud, such that they could be directly liable. More particularly, nothing in the record suggests that Mrs. Fischer and the defendant entities were "generally aware of [their] role as part of an overall illegal or tortious activity" at the time Scott Fischer allegedly perpetrated his fraudulent scheme, or that they " knowingly and substantially assist[ed] the principal violation." *N.J. Dep't of Treasury*, 904 A.2d at 784. Moreover, Plaintiff has not even alleged -- let alone proved – that these defendants made any "material misrepresentations of a presently existing or past fact," that would subject them to direct liability for fraud. *Triffin*, 926 A.2d at 368.

Accordingly, Plaintiff's fraud claims against these defendants are dismissed.[17]

---

[17] Although these defendants cannot be held directly liable on Plaintiff's fraud claims, this Opinion does not address whether Plaintiff, in the event she obtains a judgment against Byana, FIC, or Scott Fischer, could seek to recover any funds allegedly transferred to Veronika Fischer, Funder, Bowder, or Wealth Capital, in a post-judgment lawsuit, based on the premise that any such transfers were fraudulent conveyances.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is **GRANTED IN PART and DENIED IN PART**.  Summary Judgment is **GRANTED** in favor of defendants Veronika Fischer, Bowder, Funder, and Wealth Capital, on all of the claims against them, and those defendants are dismissed from this lawsuit.  Summary Judgment is also **GRANTED** in favor of Scott Fischer, Brian E. Carroll, Private Capital, FIC, and Byana on Counts I (Federal RICO), II (conspiracy to violate RICO), III (NJ RICO), IV (Violation of Section 10(b) of the Securities' Exchange Act and Securities Rule 10b-5), V (the New Jersey Uniform Securities Act), VIII (Equitable Fraud), IX (Conversion), X (Unjust Enrichment), XIV (Breach of Fiduciary Duty). Defendants Scott Fischer, Brian E. Carroll, Private Capital, FIC, and Byana's Motion for Summary Judgment as to Counts VI (Common Law Fraud/Fraud in the Inducement), and VII (Aiding and Abetting Common Law Fraud) is **DENIED**.  Scott Fischer's Motion for Summary Judgment motion on Count XI (Breach of Contract) is **DENIED,** but the claim is limited to the Breach of the FIC Promissory Note as outlined in this Opinion.  Furthermore, Michael Fagan is dismissed as a plaintiff due to lack of standing.


Date: October 30, 2019

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. Chief District Judge